**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CLEAN AIR COUNCIL,** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | |
| | : | |
| **U.S. DEPARTMENT OF THE** | : | |
| **INTERIOR et al.,** | : | **NO. 22-2741** |
| *Defendants.* | : | |

# M E M O R A N D U M

**HODGE, J.**                                              **SEPTEMBER 6, 2024**

## I.     INTRODUCTION

This is a dispute between the environmental non-profit Clean Air Council, the National Park Service, and natural gas utility Philadelphia Gas Works and its subcontractor Constellation Energy Solutions, LLC, a subsidiary of Constellation NewEnergy, Inc. over the application of the Freedom of Information Act ("FOIA") to certain documents submitted to the National Park Service as part of a project to replace the HVAC systems in approximately a dozen historical buildings in Independence National Historic Park.  Before the Court are several dueling motions for summary judgment, which primarily focus on two issues: (1) whether a previous proceeding before a state administrative agency bars this lawsuit under the doctrine of collateral estoppel; and (2) whether the National Park Service properly withheld the disputed documents as commercial or financial information[1] of the natural gas utility and its subcontractor that is confidential under FOIA Exemption 4.

---

[1]      The Court notes that Defendants in their briefing use the phrase, "confidential commercial information" in identifying one of the issues before the Court.  (ECF 25 ¶ 3; ECF 26-2 ¶ 29; ECF 26-3, at 14).  However, consistent with the Supreme Court's majority opinion in *Argus Leader*, this Court chooses to use the language of FOIA Exemption 4. *See Food Marketing Inst. v. Argus Leader Media*, 588 U.S. 427, 428 (2019) ("[The company]

## II.   BACKGROUND

The events underlying this FOIA lawsuit began on June 23, 2021, when Clean Air Council[2] ("the Council") wrote a letter to Secretary Debra Haaland of the Department of the Interior ("DOI") regarding the installation of natural gas-fueled boilers in more than a dozen historic buildings in and around Independence National Historic Park in Philadelphia, Pennsylvania. Secretary Haaland forwarded the letter to the National Park Service ("NPS"), and NPS Supervisor Cynthia MacLeod responded to the Council via letter on July 7, 2021.  In this letter, Ms. MacLeod informed the Council that NPS had hired Philadelphia Gas Works[3] ("PGW"), along with its subcontractor, Constellation Energy Solutions, LLC ("Constellation"),  to conduct engineering or feasibility studies on replacing the aging heating systems in these historic buildings. According to Ms. Macleod, those studies concluded that a natural gas-system would "reduce its contribution to CO2 emissions by 1,685 tons per year," and recommended replacing the steam-loop heat systems with natural gas-fired boilers. The feasibility studies (in their various iterations) reportedly provided the following information:

    a.  An executive summary of the suggested [Energy Conservation Measures] at [Independence Historic National Park], including HVAC upgrades, as well as the investment and savings associated with implementation of the proposed [Energy Conservation Measures];
    b.  Site information and analysis regarding [Independence Historic National Park], including an audit of buildings (including historical buildings) for [Energy Conservation Measures];

rearranges the text of Exemption 4 to create a phrase that does not appear in the statute: 'confidential commercial information.' It suggests that this synthetic term mirrors a preexisting common law term of art that covers only information whose release would lead to substantial competitive harm, but points to no treatise or case decided before Exemption 4's adoption that assigned any such meaning to the terms actually before the Court.")

[2]      Clean Air Council is a nonpartisan, non-profit section 501(c)(3) environmental health advocacy organization which achieves its mission through "public education, community action, government accountability, and enforcement of environmental laws." The Council states that it uses FOIA requests to educate the public about the activities and operations of the federal government related to the environment.

[3]      PGW is a natural gas utility and natural gas distribution operation owned by the City of Philadelphia. PGW, together with its subcontracted energy services company Constellation Energy Solutions, LLC, a subsidiary of Constellation NewEnergy, Inc. ("Constellation"), has a project implementing "energy conservation measures" for the Independence National Historic Park, including the project at issue—converting Independence National Historic Park from steam to natural gas. PGW and Constellation are intervenors in this litigation.

    c.  An energy analysis of NPS' utility data (electric, steam, natural gas, and water) provided by NPS to PGW and Constellation;

    d.  Proposed [Energy Conservation Measures] (including but not limited to details of specific HVAC and utility equipment currently in federal and historical buildings and suggested repairs and upgrades);

    e.  A description of the unique approach to be taken by Constellation as an [Energy Services Company] of PGW with respect to the proposed [Energy Conservation Measures] at [Independence Historic National Park];

    f.  A detailed analysis of the energy investment and savings of the proposed [Energy Conservation Measures], including Task Order Schedules for various proposed project scenarios; and

    g.  Project investment information, including Task Order Schedules, [Energy Conservation Measure] pricing details, allocated fixed implementation costs details, performance period expenses, and rebates and incentives.

(ECF No. 25-2 ¶¶ 15(a)–(g)).

On August 1, 2021, the Council expressed in another letter to the NPS serious concerns about the environmental impact these gas boilers would have and argued that a conversion to gas boilers is inconsistent with the environmental initiatives outlined in Executive Order 14008.[4] The Council sent this second letter to Secretary Haaland on August 2, 2021.

The Council received no response to either letter, so on October 4, 2021, the Council submitted a FOIA request to NPS seeking all information regarding PGW's work for NPS since January 1, 2017,[5] including the feasibility studies referenced in Ms. MacLeod's letter. NPS acknowledged receipt on October 7, 2021 and docketed the FOIA request as NPS-2022-000051, but did not produce any responsive documents. After following up with NPS three times, the Council filed a FOIA appeal to DOI on March 2, 2022. DOI did not acknowledge the appeal. The Council then sent the same appeal to DOI's Office of the Solicitor on March 12, 2022 but received no reply. On March 21, 2022, the Council attempted to obtain the information another way by

---

[4]     Executive Order 14008 of January 27, 2021, *Tackling the Climate Crisis at Home and Abroad*, 86 FR 7619, 7619–7633.

[5]     Though the underlying FOIA request is quite broad, the Council has clarified that its primary objective is to obtain the feasibility studies and any other documentation supporting the emissions figures described in Ms. Macleod's letter.

submitting a request under the Pennsylvania Right to Know Law directly to PGW for records pertaining to PGW's work at Independence National Historic Park.  On April 27, 2022, PGW granted the request in part, but withheld the preliminary assessment and feasibility studies as confidential and proprietary.  The Council appealed PGW's response to the Pennsylvania Office of Open Records, arguing that the records were not confidential and should be publicly disclosed under the Right to Know Law.  On July 26, 2022, the Pennsylvania Office of Open records issued a Final Determination denying Clean Air Council's appeal on the grounds that PGW and Constellation had adequately demonstrated that the records were confidential and commercial in nature and therefore exempt from public disclosure under the Right to Know Law.  The Council did not appeal this final determination.

The Council initiated this lawsuit in the Eastern District of Pennsylvania on July 14, 2022. Shortly thereafter, the parties agreed to hold the case in abeyance pursuant to the Court's Order that NPS produce non-exempt records on an ongoing basis and that NPS complete its FOIA response by October 24, 2022.

NPS completed its response on November 29, 2022, ultimately providing approximately 2,325 pages of partially redacted material.  The redactions were made pursuant to FOIA Exemptions 3, 4, 5, 6, and 7.[6]  NPS also produced an index of responsive records fully withheld under Exemption 4, which protects confidential commercial information—the feasibility studies were among those documents.  The Council filed an Amended Complaint on December 23, 2022, alleging that the feasibility studies and supporting documents were improperly withheld as confidential commercial information pursuant to an unsupported assertion of FOIA Exemption 4. *See* Am. Compl. ¶¶ 5–6, ECF No. 2.  NPS and DOI filed an answer with affirmative defenses, and

---

[6]      The Council only challenges certain withholdings and redactions made pursuant to Exemption 4.

shortly thereafter, PGW and Constellation successfully moved to intervene in the litigation.  On September 8, 2023, the parties and Intervenors filed cross-motions for summary judgment, and on January 25, 2024, the Court held oral argument.[7]

In its motion (in which Intervenor Constellation joins), Intervenor PGW presents two primary arguments: (1) the Council's Amended Complaint should be dismissed in its entirety because, according to PGW, the Council already litigated the central issue in this matter—the confidentiality and non-public nature of the disputed records—before the Pennsylvania Office of Open Records, and therefore collateral estoppel should apply; and (2) summary judgment should be granted in PGW's favor because the federal government properly withheld and redacted the disputed records consistent with FOIA Exemption 4, which protects privileged or confidential commercial or financial information. The NPS and DOI likewise maintain that assertion of Exemption 4 was proper because the materials at issue qualify as confidential under the standard set by the U.S. Supreme Court in *Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427 (2019).

The Council argues that fully withholding the feasibility studies and supporting documents is an over-application of Exemption 4 because not all the requested information therein fits within the definitions of confidentiality established in *Argus Leader*.  Specifically, the Council asserts that: (1) there is no indication that NPS provided assurances to PGW or Constellation that the disputed records would be kept wholly confidential; and (2) there is no evidence that these records are customarily kept private. According to the Council, FOIA's primary purpose of promoting government transparency "should override Defendants' nondisclosure decision . . . especially []

---

[7]      Oral argument was heard by the Late Hon. Gene E.K. Pratter. After Judge Pratter's untimely passing, the case was reassigned to the Hon. Kelley B. Hodge on May 22, 2024. (ECF No. 36).

when the basis to withhold all records per Exemption 4 is inadequate." Pl.'s MSJ at 1, ECF No. 28-1.

These motions are now ripe for resolution.  For the reasons set forth below, the Court grants Clean Air Council's motion and denies Defendants' and Intervenors' motions.

## III.   LEGAL STANDARDS

### a.   Summary Judgment Standard

A party is entitled to summary judgment if it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute is not simply "the mere existence of *some* alleged factual dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis added).  Rather, "[a] genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986)).  A moving party is entitled to summary judgment where the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323–24. FOIA cases are often resolved by summary judgment, *Seife v. FDA*, 43 F.4th 231, 238 (2d Cir. 2022), and the evidence is typically limited to affidavits submitted by the information owner and the agency. *Id.* (citing *Long v. Off. Of Pers. Mgmt.*, 692 F.3d 185, 190 (2d Cir. 2012)). Summary judgment for the agency in a FOIA case is appropriate "when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Id.* (quoting *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 73 (2d Cir. 2009)).

b.    **FOIA**

The primary purpose of FOIA is "to facilitate public access to government documents." *U.S. Dep't of State v. Ray*, 502 U.S 164, 173 (1991); *see also Manna v. U.S. Dep't of Just.*, 51 F.3d 1158, 1163 (3d Cir. 1995).  FOIA is "designed to 'pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Ray*, 502 U.S. at 173 (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)). Although the default under FOIA is public disclosure, some limited exemptions to this presumption exist in an effort to "balance the public's interest in governmental transparency against the 'legitimate governmental and private interests that could be harmed by the release of certain types of information.'" *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 559 (D.C. Cir. 2010).  Of the nine exemptions specified in FOIA, the one relevant here is Exemption 4, which shields from disclosure records that: (1) were "obtained from a person"; (2) contain "commercial or financial information"; and (3) are "privileged or confidential." 5 U.S.C. § 552(b)(4).

In *Argus Leader*, the U.S. Supreme Court held that the term "confidential" must be given the "ordinary, contemporary, common meaning," it had when FOIA was enacted in 1966.  588 U.S. at 433-34.  Since FOIA fails to provide any definition of "confidential" in its text, the Supreme Court determined that the term "confidential" meant then, as it does now, "private" or "secret." *Id.* at 434 (quoting Webster's Seventh New Collegiate Dictionary 174 (1963)). In doing so, the Court abrogated the prior standard that required a showing that disclosure of purportedly confidential information would either: (1) impair the government's ability to obtain necessary information in the future; or (2) cause substantial harm to the competitive position of the person from whom the information was obtained. *Id.* at 433–34, (abrogating *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 770 (D.C. Cir. 1974)).  Under *Argus Leader*, "information communicated to another

remains confidential whenever it is customarily kept private, or at least closely held, by the person imparting it." *Id.* at 434.   The Court also stated that a second condition—assurances of confidentiality from the recipient—could also apply.  *Id.*

## IV.   DISCUSSION

### a.   Clean Air Council is Not Collaterally Estopped

There is a four-prong analysis that is applied to determine if collateral estoppel precludes an issue from being decided. To apply collateral estoppel, the Court must find:

> (1) the identical issue was decided in a prior adjudication; (2) there was a final judgment on the merits; (3) the party against whom the bar is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom the bar is asserted had a full and fair opportunity to litigate the issue in question.

*Doe v. Herketh*, 828 F.3d 159, 171 (3d Cir. 2016).  Intervenors PGW and Constellation maintain that this litigation is collaterally estopped because the confidentiality and non-public nature of the records at issue were already litigated before the PA Office of Open Records.   The Council disagrees and argues that this litigation does not meet the first or fourth prongs of the test. Specifically, the Council asserts that the issues litigated before the PA Office of Open Records are not identical to those in the instant litigation because the PA Office of Open Records was tasked with reviewing PGW's decisions to withhold documents under the state enacted Pennsylvania Right to Know Act, and this Court must determine whether the DOI and NPS validly withheld documents under Exemption 4 to FOIA, a federal statute.  The Council also argues that it did not have the opportunity to litigate the federal agencies' decision-making before the PA Office of Open Records because during the state proceeding, only PGW's compliance with state law was reviewed.

**A. The issues at bar and the issues before the PA Office of Open Records are not identical.**

The first prong—identity of issues—requires the Intervenors to show that the issue before the PA Office of Open Records is identical to the issue raised here. *See Raytech Corp. v. White*, 54 F.3d 187, 191 (3d Cir. 1995). In evaluating identity, the Court must first "identify the precise question or questions at issue [in both proceedings]." *Id.*

The parties' dispute regarding identity is, at its core, a matter of framing. The Intervenors frame the issue litigated at the PA Office of Open Records—and the issue to be resolved here—as being "whether Constellation's and PGW's records were properly withheld from public disclosure because they are confidential and non-public in nature." (ECF No. 25-2, at 15). The Council frames the issue differently. The Council states more precisely that the PA Office of Open Records was tasked with determining the validity of *PGW's* confidentiality designations made pursuant to *state law,* whereas the Court must review the *federal government's* decisions to withhold documents as confidential pursuant to *federal law.* (ECF No. 32-1, at 3–4). According to the Intervenors, this is a distinction without a difference, because the United States Supreme Court "has ruled that collateral estoppel may preclude a later claim involving the same set of facts but a different statute." *Id.* at 15–16 (citing *B & B Hardware v. Hargis Industries*, 575 U.S. 138 (2015)).

But the Intervenors' reliance on *B & B Hardware* is misplaced. In that case, the Supreme Court determined that a claim made under one section of federal trademark law was precluded by an earlier administrative determination made pursuant to a different section of federal trademark law. *See B&B Hardware*, 575 U.S. at 160. In reaching that decision, the Supreme Court clarified that the "real question" courts must ask when confronted with two different provisions or statutes is whether the relevant legal standard provided in the one section "is the same standard" provided in the other section. *Id.* at 154–55. The Court concluded that the standards at issue in *B&B*

*Hardware* were the same for three reasons: (1) the operative language in both sections is "essentially the same";[8] (2) the operative language used in one section—the "likelihood-of-confusion language"—has been "central" to the application of the other section; and (3) the two sections are often intertwined in litigation such that "[t]here is no reason to think that the same district judge in the same case should apply two separate standards . . . ." *Id*. at 155.

This case is distinguishable from *B & B Hardware* for several reasons.  First, *B & B Hardware* involved two sections of the *same federal statute*, whereas in this case the two relevant statutes are a state statute—which imposes obligations on state-level entities—and a federal statute—which imposes obligations on the federal government.  Second, the pertinent language in the PA Right to Know Law and FOIA Exception 4 are not "essentially the same," and the legal tests for interpreting that language in each are different.

Section 708(b)(11) of the PA Right to Know Law exempts from disclosure "[any] record that constitutes or reveals a trade secret or confidential proprietary information." 65 P.S. § 67.708(b)(11).  The PA Right to Know Law defines these terms.  First, "trade secret" is defined as

> Information, including a formula, drawing, pattern, compilation, including a customer list, program, device, method, technique or process that:
> (1) Derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

---

[8]     "Compare 15 U.S.C. § 1114(1) ('Any person who shall . . . use in commerce any . . . mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is *likely to cause confusion, or to cause mistake, or to deceive* . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided' (emphasis added)) with § 1052(d) ('No trademark . . . shall be refused registration . . . unless it . . . [c]onsists of or comprises a mark which so resembles as mark registered in the Patent and Trademark Office . . . as to be *likely*, when used on or in connection with the goods of the applicant, *to cause confusion, or to cause mistake, or to deceive* . . .' (emphasis added)).  *B&B Hardware, Inc.*, 575 U.S. at 155 n.3.

65 P.S. § 67.102. "Confidential proprietary information" is defined as "[c]ommercial or financial information received by an agency: (1) which is privileged or confidential; and (2) the disclosure of which *would cause substantial harm to the competitive position of the person that submitted the information*." *Id.* (emphasis added).  In determining whether certain information is "confidential," the PA Office of Open Records considers "the efforts the parties undertook to maintain their secrecy." *Commonwealth v. Eiseman*, 85 A.3d 1117, 1128 (Pa. Commw. Ct. 2014), *rev'd in part, Pa. Dep't of Pub. Welfare v. Eiseman*, 125 A.3d 19 (Pa. 2015).  Therefore, the PA Office of Open Records endeavored to determine whether PGW (the state administrative agency) and Constellation (PGW's private subcontractor) made an effort to maintain the secrecy of the records in dispute. *See, e.g.,* ECF No. 25-6, at 15.  In making this determination, the Office of Open Records relied exclusively on the affidavits of representatives of PGW and Constellation.  *Id.* at 17.

FOIA Exemption 4 restricts mandatory disclosure of "commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4).  Unlike the PA Right to Know Law, FOIA does not explicitly define "confidential."  Thus, the operative language in the PA Right to Know Law and FOIA is not "essentially the same."

Moreover, the Supreme Court's recent interpretation of FOIA Exemption 4 in *Food Marketing Institute v. Argus Leader Media*, 588 U.S. 427 (2019) only widens the gap between the two provisions.  In *Argus Leader*, the Supreme Court abrogated the previous "substantial harm" requirement, and established that, at the very least, information is only confidential under FOIA Exemption 4 if it is both customarily and actually treated as private by its owner.  *Id.* at 433–34.  The Supreme Court also intimated that a second prong may also be necessary, that prong being whether the commercial or financial information was provided under an assurance of privacy. *Id.*

at 434. Thus, the standard for confidentiality under the PA Right to Know Law requires only that the Office of Open records review the efforts PGW and Constellation undertook to maintain their secrecy. The standard under FOIA requires the Court to *at least* review both the efforts PGW and Constellation undertook to maintain their secrecy and whether PGW and Constellation customarily treat such information as secret. And, under *Argus Leader*, FOIA may even require a third step—whether PGW and Constellation received assurances of confidentiality from the federal government. These are substantial differences requiring the relevant adjudicatory body to focus on different evidence, the actions of different parties, and answer different legal questions. Thereby requiring a different legal analysis under the PA Right to Know Law compared to FOIA.

As the Council points out, The PA Office of Open Records did not make any findings about whether the disputed records are "customarily" treated as private by PGW and Constellation, or whether the information was provided to the federal government under an assurance of privacy from NPS or DOI. Moreover, whether *Argus Leader* even requires assurances of privacy. The Office of Open Records likewise did not adjudicate whether the federal government correctly enforced FOIA, which ultimately is the question the Court must answer here. Thus, the first collateral estoppel prong is not met.

**B. The Council did not have a full opportunity to litigate the issue at bar before the PA Office of Open Records.**

Notwithstanding the lack of identity, collateral estoppel does not preclude this litigation because the Council did not have a full and fair opportunity to litigate the validity of the federal government's application of FOIA Exemption 4 to the disputed documents during the proceedings before the PA Office of Open Records. The Intervenor's argument to the contrary is mooted by the basic fact that, at the time of the appeal, NPS and DOI had yet to respond to the Council's FOIA request. In other words, it is temporally impossible for the Council to have fully litigated

the issue because the federal government had not yet applied Exemption 4 to withhold or redact the disputed records.

Although the NPS participated to a limited extent in the proceedings before the PA Office of Open Records, that participation was entirely focused on the PA Right to Know Law and possible application of FOIA Exemption 7(F) to some of the records at issue in that proceeding. FOIA Exemption 7(F) protects against the disclosure of records that "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. (b)(7)(F). In those proceedings NPS argued that portions of the records at issue should not be released because the records included descriptions and visuals "revealing the locations of certain critical infrastructure and equipment (utility lines, pipes, etc.) within a number of buildings in [Independence National Historic Park] [that] were flagged . . . as having the potential to create security vulnerabilities if they were to be made public, since, if aggregated, the information could potentially be used to damage these buildings, disrupt operations, and threaten public safety . . ." (ECF No. 25-10 at ECF 4). There is absolutely *no* discussion of FOIA Exemption 4 in NPS's position statement, or in the Office of Open Records' Final Determination memorandum, ECF No. 25-6.

Thus, the Court concludes that the proceedings before the PA Office of Open Records do not preclude this action and denies summary judgment as to collateral estoppel.

### b.   NPS and DOI and the Application of Exemption 4

#### A. FOIA and The Presumption of Disclosure

The Court notes at the outset that FOIA's presumption of disclosure guides its analysis of DOI and NPS's decision to withhold the feasibility studies and supporting documents. *See Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976) ("To make crystal clear the objective of [FOIA] . . ., 'to pierce the veil of administrative secrecy and to open agency action to the light of public

scrutiny,' Congress provided . . . that nothing in the Act should be read to 'authorize withholding

of information or limit the availability of records to the public, except as specifically stated . . . .'"

(quoting 495 F.2d at 263)).  It is well-established that FOIA's "limited exemptions do not obscure

the basic policy that disclosure, not secrecy, is the dominant object of [FOIA]." *Rose*, 425 U.S. at

361; *see also John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 150 (1989). Exemption 4, like

all the specified exemptions to FOIA, "[is] explicitly made exclusive . . . and must be narrowly

construed." *Rose*, 425 U.S. at 361 (first quoting *Environmental Protection Agency v. Mink*, 410

U.S. 73, 79 (1973) then citing *Vaughn v. Rosen*, 484 F.2d 820, 823 (1973)). With FOIA's purpose

in mind, the Court turns to whether the feasibility studies and supporting documents withheld by

DOI and NPS are exempt from mandatory disclosure under Exemption 4.

### B.  Exemption 4 and *Argus Leader*

Exemption 4 permits nondisclosure of records containing "trade secrets and commercial or

financial information obtained from a person and privileged or confidential . . . ." 5 U.S.C. §

552(b)(4).  Thus, there are two categories of records exempt under this provision: (1) information

that is proprietary, patented, or constituting a "trade secret"; and (2) any commercial or financial

information obtained from a person that is confidential.  A "trade secret" under Exemption 4 is "a

secret, commercially valuable plan, formula, process, or device that is used for the making,

preparing, compounding, or processing of trade commodities and that can be said to be the end

product of either innovation or substantial effort." *Public Citizen Health Grp. v. FDA*, 704 F.2d

1280, 1288 (D.C. Cir. 1983).  Records that do not meet the definition of "trade secret" can still be

protected from disclosure under Exemption 4 if they are commercial and financial, obtained from

a person, and are "privileged or confidential."  Here, the parties do not dispute that the feasibility

studies and supporting documents are commercial or financial and were obtained "from a person."

The Court therefore will focus on the sole issue in dispute of whether they are "privileged or confidential."

In *Argus Leader*, the Supreme Court replaced the previously existing "substantial harm" standard for determining "confidentiality" by holding that the term "confidential" must be interpreted consistent with its "ordinary, contemporary, common meaning" when Congress enacted FOIA in 1966. *Argus Leader*, 588 U.S. at 433–34.  The Supreme Court ruminated further on this definition, noting, "In one sense, information communicated to another remains confidential whenever it is customarily kept private, or at least closely held, by the person imparting it . . . . In another sense, information might be considered confidential only if the party receiving it provides some assurance that it will remain secret." *Id.* at 434.  But the Supreme Court posed the question, "[m]ust both of these conditions be met for information to be considered confidential under Exemption 4?" *Id.*  According to the Supreme Court, "[a]t least the first condition has to be; it is hard to see how information could be deemed confidential if its owner shares it freely . . . But what about the second condition: Can privately held info *lose* its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private?" *Id.* at 434–35.  Unfortunately, the Supreme Court had no need to resolve this latter question in *Argus Leader*, because the information at issue in that case clearly met both conditions. *Id.*  Despite this, the majority opinion does note the following in its holding: "At least where commercial or financial information *is both customarily and actually* treated as private by its owner *and* provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4." *Id.* at 440 (emphasis added).  In other words, satisfying both conditions is clearly sufficient to establish confidentiality under Exemption 4, but it is less clear if and when failing to meet the second

condition requires public disclosure. Whether "privately held information [can] lose its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private" is an open question. *See id.* at 434–35.

Although several courts "have resolved Exemption 4 disputes since [*Argus Leader*], none has held that this potential second prong *must* be met. Stated differently, no court has determined that 'privately held information lose[s] its confidential character for purposes of Exemption 4 if it's communicated to the government without' privacy assurances." *Renewable Fuels Ass'n v. U.S. Env't Prot. Agency*, 519 F. Supp. 3d 1, 12 (D.D.C. 2021) (internal citations omitted) (quoting *Argus Leader*, 588 U.S. at 434). Importantly, none of these courts have had any reason to find the second *Argus Leader* prong mandatory because in those cases, the parties submitted sufficient evidence to satisfy both conditions or failed to satisfy even the first.[9] *See, e.g., Seife v. FDA*, 43 F.4th 231, 238 n.6 (2d Cir. 2022); *New York Times Co. v. FDA*, 529 F.Supp.3d 260, 285 (S.D.N.Y. March 29, 2021).

The Council argues that the Government's decision to withhold the feasibility studies and supporting documents in whole, pursuant to Exemption 4, fails to meet *either* prong of the *Argus Leader* test. According to the Council, there is weak evidence that NPS provided assurances to Constellation or PGW that the feasibility studies would remain confidential, and undisputed facts actually show the opposite, including a provision in the contract between NPS and Constellation

---

[9]   With one exception: *Renewable Fuels Association v. United States Environmental Protection Agency*, 519 F.Supp.3d 1, 12 (D.D.C. 2021). In that case, the district court rejected the plaintiffs' argument that, because the EPA failed to provide express or implied assurances of confidentiality, the information at issue is not confidential under *Argus Leader*. The court declined to be "the first" court to hold that "'privately held information loses its confidential character . . . if it's communicated to the government without' privacy assurances" because the current law of the D.C. Circuit—which is binding on that district court—is that information is confidential under Exemption 4 "if it is of a kind that would customarily not be released to the public by the person [or entity] from whom it was obtained." *Renewable Fuels Assoc.*, 519 F.Supp.3d at 12 (quoting *Critical Mass Energy*, 975 F.2d at 879). Thus, the question of whether confidential information can lose its confidential character if it is communicated to the government without privacy assurances was foreclosed by D.C. Circuit precedent. The Third Circuit has not weighed in yet on this specific issue, so the question remains open in this Circuit.

that provides that the feasibility studies may be subject to a public-facing National Environmental Protection Act ("NEPA") environmental assessment and a review under the National Historic Preservation Act ("NHPA").  The Council also argues that there is little evidence that these feasibility studies in whole are customarily held private or secret—even if certain methodologies or formulas discussed within the studies are redacted, asserting "there is no basis to extend this cloak of secrecy to <u>all</u> the information, such as numerical data or engineering results." Pl.'s MSJ at 6, ECF No. 28-1.

The Defendants and Intervenors disagree with the Council.  They maintain that the feasibility studies and supporting documents are "confidential" under both *Argus Leader* prongs because the evidence shows that: (1) the information contained in the feasibility studies is customarily and actually treated as private consistent with the factors discussed in *Zirvi v. United States National Institutes of Health*, No. 20-7648, 2022 WL 1261591 (D.N.J. April 28, 2022); and (2) the information contained in the feasibility studies and supporting documents was provided to the federal government under an express or implied assurance of confidentiality.

       *i.*       *"Customarily and actually treated as private"*

There is very little caselaw to guide this Court's analysis of the *Argus Leader* prongs.  But, in keeping with at least one other court in this Circuit, in determining whether the information is "customarily" or "actually" treated as private, this Court will review the practices of the information owner by considering the following factors, as relevant: (1) whether the information owner restricts access to the records to certain personnel; (2) whether any restrictive markings are applied to the documents; (3) whether the information is protected using secure technology systems or password protection; and (4) whether the information owner requires confidentiality

agreements to access the information. *See Zirvi*, 2022 WL 1261591, at *5 (citing *Am. Small Bus. League v. United States Dep't of Def.*, 411 F. Supp. 3d 824, 831 (N.D. Cal. 2019)).

The Defendants and Intervenors argue that the record in this case demonstrates that PGW and Constellation customarily and actually treat the information at issue as private and confidential. According to PGW and Constellation, they marked the feasibility studies and supporting documents "Confidential," Teme Decl., ¶¶ 22–23, 30–31, 33–38, ECF No. 25-3, they took measures to protect this information from public disclosure in the proceedings before the PA Office of Open records, *id.*, they produced these records in a concurrent litigation under the conditions of a protective order, *id.*, they only submitted the records to certain individuals at NPS, and they "uploaded these documents via secure method such as by a secure link[,]" Wind Decl. ¶ 8, ECF No. 25-4; Godleski Decl. ¶13, ECF No. 25-5.

The Council responds by pointing out the lack of evidence of PGW's and Constellation's *customary practices*. According to the Council, it is not sufficient for Exemption 4 purposes for the submitter to simply attest "that they do not customarily release [the] information to the public." Pl.'s MSJ at 10, ECF No. 28-1. The Court agrees that it is not enough for PGW and Constellation to simply "invoke the magic words – 'customarily and actually kept confidential.'" *New York Times Co. v. FDA*, 529 F. Supp. 3d 260, 284–85 (S.D.N.Y. 2021). Rather, they must "adequately describe the steps it takes to keep the information at issue confidential. Those steps must seem reasonable to the producing agency (or, if litigation results, the reviewing court), and the company must attest that they have succeeded in maintaining the information's confidentiality." *Id.* at 285. Although the affidavits[10] submitted by PGW, Constellation, and NPS thoroughly describe the

---

[10] In the context of FOIA, the submitter and recipient may establish submitter custom and actual practice for purposes of Exemption 4 by sworn affidavits. *See Ctr. for Investigative Reporting*, 436 F.Supp.3d at 110-11; *Naumes*, 588 F.Supp.3d at 38–39. "Agency affidavits generally are 'accorded a presumption of good faith which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents.'"

circumstances in which the feasibility studies and supporting documents were submitted to NPS and detail *why* release of at least some of the information contained in the studies would harm PGW and Constellation, they do not sufficiently describe the steps PGW and Constellation *customarily* take to keep information of this sort confidential.

For example, Floriam Teme, Vice President of Marketing at PGW, declares: "The . . . Feasibility Studies (including iterations thereof and information therefrom) were marked 'Proprietary and Confidential' in their entirety . . . [and] [b]ased on PGW and Constellation's treatment of the above-described records and information contained therein, and similar treatment of similar records and information in the energy industry, PGW reasonably believed that these records and the information contained therein would not be publicly disclosed." Teme Decl. ¶¶ 22–23, ECF No. 25-3.  Walter L. Godleski, Executive Director of Sales for Constellation, attests:

> Constellation marked its Preliminary Assessment and Feasibility Studies as 'Confidential and Proprietary' before those materials were submitted to PGW. Constellation intended and expected that PGW and every necessary recipient of the materials so designated would respect the confidentiality of those materials. Constellation reasonably expected that those materials would be exempt from disclosure to the public, and specifically to Constellation's ESCO competitors through a FOIA request . . . To protect the confidentiality of Constellation's Preliminary Assessment and Feasibility Studies, Constellation submitted those documents directly to the USDOI during the course of a secure Microsoft Teams meeting through a likewise secure link Constellation provided.

Godleski Decl. ¶¶ 12–13, ECF No. 25-5.  And in his declaration, NPS Contracting Officer Tim Wind attests:

> As part of my role on the Project, I received copies of these submissions from PGW and Constellation . . . PGW and Constellation generally provided the submissions to me and other NPS employees involved in the Project by providing a link to a secure, internet-based share-file system. To access the files, the system required me

---

*Venkataram v. Office of Information Policy*, 2013 WL 3871730, at *3 (D.N.J. July 25, 2013) (quoting *Negley v. FBI*, 169 v. FBI, 169 F. App'x 591, 594 (D.C. Cir. 2006)).  The Court credits these affidavits to the extent they present facts. The Court does not credit any *legal* conclusions, *i.e.,* that the circumstances in which Constellation submitted the feasibility studies establishes that Constellation customarily and actually treated the information contained therein as private as a matter of law under *Argus Leader*.

to login using my government email address and a password that was personal to
me . . . The submissions to NPS from PGW and Constellation also included written
legends marking them as 'Proprietary and Confidential.

Wind Decl. ¶¶ 7–8, 15, ECF No. 25-4.  *See also* McHugh Decl. ¶¶ 46–47, 52–53, ECF No. 26-4

("NPS fully withheld records under Exemption 4 that PGW and Constellation had identified to

NPS as containing their commercial information that they would customarily keep private . . . .").

This is the description of Constellation's and PGW's efforts to keep the kind of information

at issue private.  When one compares these declarations with those found to be sufficient in other

post-*Argus Leader* cases, PGW and Constellation's declarations lack the depth and detail regarding

their processes thereby making the deficiencies clear.  For example, in *Seife v. FDA*, the court

found the records confidential based on a company representative's declaration attesting that "such

information is subject to strict confidentiality protocols both within and outside [the company]."

492 F. Supp. 3d. at 276. And in *New York Times Co. v. FDA*: "The . . . Declaration clearly states

that all of the records at issues are 'treated as highly confidential within the Company and are

stored on secure IT networks that are password-protected and/or encrypted conditions designed to

ensure their confidentiality . . . [and] are not customarily shared with individuals who are not

employees of the Company, and access is granted to employees only [on] a need-to-know basis."

529 F. Supp. 3d 260, 284 (S.D.N.Y. 2021). Here, the Court is uncertain as to how Constellation

and PGW customarily protect the sort of information communicated through feasibility studies,

internally and externally.  The Court will not engage in speculation in the absence of clarity.

Constellation and PGW should be able to attest to those customary practices—especially since

they state the feasibility studies contain information allegedly central to their business practices,

and the Independence National Historic Park project is not their "first rodeo."  *See* Teme Decl. ¶¶

8–10, ECF No. 25-3; Godleski Decl. ¶ 6.

Furthermore, unlike the parties in *Zirvi*, Constellation and PGW did not enter into a confidentiality agreement with NPS prior to submitting the feasibility studies and supporting documents. Of course, the existence or nonexistence of a confidentiality agreement between the submitter and recipient is just one of several factors outlined in *Zirvi* that the Court may consider in determining whether information was customarily and actually treated as private. But the factor is undeniably weighty. An agreement between the submitter and recipient—particularly a recipient with well-known public disclosure obligations like the federal government—to maintain confidences is a touchstone of the confidential exchange of information, and such agreements (or lack thereof) feature in courts' Exemption 4 analysis post-*Argus Leader. See, e.g., New York Times Co. v. FDA*, 529 F. Supp. 3d 260, 283–84 (S.D.N.Y. 2021); *Zirvi*, 2022 WL 1261591 at *5; *Varnum LLP v. United States Department of Labor*, 2021 WL 13877773, at *5–*6 (W.D. Mich. March 15, 2021).[11]

The lack of a confidentiality agreement here becomes even more conspicuous when one considers the totality of the circumstances in which Constellation and PGW disclosed to NPS. Specifically, the contract between NPS and Constellation and PGW contains a provision requiring Constellation and PGW to ensure that the "final [feasibility studies] product . . . contain sufficient detail . . . to support subsequent compliance reviews under the National Environmental Protection Act (NEPA) and National Historic Preservation Act (NHPA)." Pl.'s MSJ at 6, ECF No. 28-1. A compliance review under NEPA includes an "environmental assessment," which is "a concise *public* document prepared by a Federal agency to aid an agency's compliance with the Act and support its determination of whether to prepare an environmental impact statement or a finding of

---

[9]     The Court notes that the government may provide assurances of privacy without entering into a confidentiality or non-disclosure agreement, like through agency regulations and established agency practice. *See, e.g., AMA Systems, LLC v. U.S. Food & Drug Admin.*, 20214 WL 712465, at *8 (D. Md. Feb. 21, 2024).

no significant impact, as provided in § 1502.6 of this chapter." 40 U.S.C. § 1508.1(h). Thus, the contract put Constellation on notice that the information contained in the feasibility studies would, if necessary, be used to prepare at least one public-facing document under NEPA.  The information could also be part of the NPS's public-facing compliance with the NHPA, which requires that each federal agency identify and assess the effects its actions may have on historic buildings.[12]  That Constellation submitted the feasibility studies pursuant to a contract which provided that the information contained therein was potentially subject to mandatory public disclosure renders the absence of a confidentiality agreement all the more important.  Because of the lack of a confidentiality agreement, and the lack of evidence regarding PGW's and Constellations' customary practices regarding feasibility studies, the Court is persuaded that the Defendants and Intervenors have failed to satisfy even the first prong of *Argus Leader*, at least as to information contained in the feasibility studies and supporting documents relevant to NPS's theoretical compliance with NEPA and NHPA.

Even if the evidence contained within the affidavits was sufficient to establish customary practice, the lack of a confidentiality agreement and the NEPA/NHPA contract provision raises the question left open by *Argus Leader*—can "privately held information lose its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private[?]" *Argus Leader*, 588 U.S. at 434–35.

To answer this question, the Court must first determine whether NPS provided assurances of privacy, notwithstanding the lack of a confidentiality agreement and the contract provision regarding NEPA and NHPA.

---

[12]     *See Section 106: National Historic Preservation Act of* 1966, U.S. General Services Administration (June 6, 2023), https://www.gsa.gov/real-estate/historic-preservation/historic-preservation-policy-tools/legislation-policy-and-reports/section-106-of-the-national-historic-preservation-act.

    *ii.*    *"Assurances of privacy"*

  Assurances of privacy may be express or implied.  *See N.Y. Times Co. v. FDA*, 529 F.

Supp. 3d 260, 285 & n.17 (S.D.N.Y. 2021); *Seife*, 492 F. Supp. 3d at 276.  In *Argus Leader*, the

U.S. Supreme Court recognized that relevant federal rules and regulations may, by their very

existence, provide an express assurance of confidentiality.  *Argus Leader*, 588 U.S. at 435.  The

Defendants and Intervenors argue that the procurement-integrity rules provided in the Federal

Acquisition Regulations ("FAR") provide an express assurance of confidentiality.  NPS personnel

engaged in government contracting related to the Independence National Historical Park project

are subject to FAR 3.104–4, which forbids the disclosure of contractor bid or proposal information

or source selection information, and requires agency employees to protect against unauthorized

disclosure of such information.  *See* 48 C.F.R. §§ 3.104–4(a)–(b); Wind Decl. ¶ 11, ECF No. 25-

4.  FAR 2.101 defines "source selection information" as "information that is prepared for use by

an agency for the purpose of evaluating a bid or proposal to enter into an agency procurement

contract, if that information has not been previously made available to the public or disclosed

publicly."  *See* 48 C.F.R. § 2.101.  According to NPS, source selection information includes,

among other things: "(1) bid prices submitted in response to an agency invitation for bids, or lists

of those bid prices before bid opening; (2) proposed costs or prices submitted in response to an

agency solicitation, or lists of those proposed costs or prices; (3) source selection plans; (4)

technical evaluation plans; (5) technical evaluations of proposals; and (6) cost or price evaluations

of proposals."  Wind Decl. ¶ 13, ECF No. 25-4; *see* 48 C.F.R. 2.101.

      Defendants and Intervenors argue that the feasibility studies and supporting documents are

"source selection information" subject to non-disclosure under FAR 3.104–4.1, therefore that

regulation provides express assurances of confidentiality.  But, as the Council asserts, the

feasibility studies and supporting documents are contracts, not procurement or source selection, records.  The Court agrees. FAR 2.101 defines "contract" as:

> [A] mutually binding legal relationship obligating the seller to furnish the supplies or services (including construction) and the buyer to pay for them . . . In addition to bilateral instruments, contracts include (but are not limited to) awards and notices of awards; job orders or task letters issued under basic ordering agreements; letter contracts; orders, such as purchase orders, under which the contract becomes effective by written acceptance or performance; and bilateral contract modifications.

48 C.F.R. 2.101. On the other hand, "source selection" involves "information that is prepared for use by an agency for the purpose of *evaluating a bid or proposal to enter into* an agency procurement contract . . ." *Id.* In short, FAR 3.104–4.1's disclosure prohibition applies to information submitted during the process of winning a contract but does not apply to information submitted after a bid awardee is selected.  Here, NPS produced two signed contracts—one for the preliminary assessment and one for the feasibility studies.  Thus, the feasibility studies were not submitted to NPS as part of an official bid to supply energy to NPS, but were the object of contracts already awarded to PGW and Constellation.  Because the feasibility studies and supporting documents are not "source selection information," FAR 3.104–4(a)–(b) does not apply and therefore could not have provided express assurances of confidentiality.[13]  Moreover, the affidavits of PGW and Constellation personnel simply do not assert that the feasibility studies and supporting documents were provided to NPS under even the mistaken assumption that FAR prohibited disclosure of those documents.  *See generally* Teme Decl, ECF No. 25-3 (no mention of FAR);

---

[13]       Defendants and Intervenors also argue that the decision to withhold the studies is consistent with the FOIA Improvement Act of 2016 ("FIA"), 5 U.S.C. § 552, which provides that an agency can only withhold information if "(I) the agency reasonably foresees that disclosure would harm an interest protected by an exemption . . . or (ii) disclosure is prohibited by law." 5 U.S.C. § 552 (a)(8)(A)(i)(I)-(II). According to Defendants and Intervenors, the information at issue satisfies the second FIA condition because FAR prohibits its disclosure. As discussed, that is not the case. Moreover, FIA was passed to prevent "some agencies [from] overusing FOIA exemptions," *Seife v. FDA*, 43 F. 4th 231, 235 (2d Cir. 2022), so it purports to impose additional burdens on parties trying to justify the application of a FOIA exemption.

Godleski Decl., ECF No. 23-5 (no mention of FAR); *see Argus Leader*, 588 U.S. at 433–34
(assurances of privacy analysis focusing on the person providing the information, not the
recipient).  In sum, Intervenors and Defendants have failed to provide sufficient evidence of any
express assurances of privacy.

> PGW, Constellation, and NPS also assert, however, that there were implicit assurances of
confidentiality from the context in which the feasibility studies were submitted to the government.
Post-*Argus Leader*, courts have found implied assurances of privacy in a variety of contexts.  For
example, in *Flyers Rights Education Fund, Inc. v. Federal Aviation Admin.*, the court found that
supporting declarations detailed "'implied' assurances of privacy based on context and the history
of the FAA and Boeing's relationship" because the declarations describe "decades" of submissions
made "with an understanding and expectation that the FAA would treat [the information] as
private."  2021 WL 4206594, *8 (D.D.C. Sept. 16, 2021).  The *Flyers Rights* declarations also
emphasize that the FAA has "repeatedly made clear, in a variety of guidance documents . . . that
it will protect from public disclosure [this type of information" and has "a longstanding history of
maintaining confidentiality of [such information.]"  *Id.*  The affidavits submitted in this case do
not contain the same, or closely similar, averments regarding PGW, Constellation, and the NPS;
in fact, there is no discussion of previous dealings between these parties, or whether NPS generally
maintains the confidentiality of feasibility studies not subject to FAR 3.104-4.  Moreover, any
"assurance of privacy" implied by the context in which the feasibility studies were submitted is
undermined by the NEPA/NHPA provision in the contract which states that the final feasibility
study must contain sufficient information to enable NPS to meet its public-facing obligations under
NEPA and NHPA.  Thus, Defendants and Intervenors have not put forth sufficient evidence of
assurances of privacy, express or implied.

Having concluded that there is insufficient evidence that PGW and Constellation submitted the feasibility studies and supporting documents under an assurance of privacy, the Court turns to the question of whether "privately held information [can] lose its confidential character for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private?"  588 U.S. at 434–35. Here, the Court determines the answer is yes, at least to *some* of the information contained in the feasibility studies and supporting documents.[14]  Thus, a level of deliberate scrutiny is warranted to determine what information may be provided and ensure the purpose of FOIA is maintained – transparency coupled with necessary protections noted as exceptions.  PGW and Constellation submitted feasibility studies to NPS under the terms of a contract which explicitly required those studies to be sufficiently detailed so that NPS could use the information contained therein to meet its public-facing obligations under NEPA and NHPA. Moreover, PGW and Constellation submitted the studies without the protection of a confidentiality agreement, despite knowing that NPS is required to release information to the public about its activities under a variety of federal statutes, including (of course) FOIA.

For the reasons stated, the Court concludes that there is insufficient evidence that PGW and Constellation customarily treat all of the information contained in the feasibility studies and supporting documents as confidential.  The Court also concludes that even if PGW and Constellation demonstrated that this information is customarily treated as confidential, there is insufficient evidence that they submitted the feasibilities studies under an assurance of privacy. The evidence reflects the contrary, because the NEPA/NHPA provision in the contract put

---

[14]    PGW and Constellation submitted feasibility studies to NPS under the terms of a contract which explicitly required those studies to be sufficiently detailed so that NPS could use the information contained therein to meet its public-facing obligations under NEPA and NHPA. Moreover, PGW and Constellation submitted the studies without the protection of a confidentiality agreement, despite knowing that NPS is required to release information to the public about its activities under a variety of federal statutes, including (of course) FOIA.

Constellation and PGW on notice that at least some of the information contained within the feasibility studies was potentiality subject to mandatory public disclosure.

The Court is cognizant that not all of the information contained in the feasibility studies would be subject to public disclosure under NEPA and/or NHPA. But the Court agrees with the Council that withholding the feasibility studies and supporting documents in their entirety is an overapplication of Exemption 4. As such, the Court will order NPS to revisit its segregation determination and produce any portions of the feasibility studies and supporting documents relevant to NPS's theoretical compliance with NEPA or NHPA, *e.g.,* "summaries of 'energy conservation measures,' proposed energy conservations measures, assessment results, and employee roles.'" Pl.'s Resp. in Opp. at 10–11, ECF No. 32-1. NPS will not be required to produce previously withheld information that is "inextricably intertwined" with exempt portions of the studies, *i.e.,* pricing and incentive information, but to the extent that NPS determines that it must withhold the documents in their entirety as inextricable, the Court will conduct an *in camera* review so as to be able to make "specific findings of segregability regarding the documents to be withheld." *Sussman v. United States Marshalls Service*, 494 F.3d 1106, 1116 (D.C. Cir. 2007).

V.    CONCLUSION

For the reasons set out in this Memorandum, the Court grants the Plaintiff's motion, and denies Defendants' and Intervenors' motions. An appropriate order follows.

BY THE COURT:

/s/ Hon. Kelley B. Hodge

_____

HODGE, KELLEY B., J.